Marina A. Torres (SBN 259576)
mtorres@willkie.com
Logan M. Elliott (SBN 268105)
lelliott@willkie.com
WILLKIE FARR & GALLAGHER LLP
2029 Century Park East, Suite 2900
Los Angeles, California 90067
Telephone:  (310) 855-3000
Facsimile:  (310) 855-3099

Michael J. Gottlieb (*Pro hac vice forthcoming*)
mgottlieb@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K St N.W.
Washington, D.C. 20006
Telephone: (202) 303-1000
Facsimile:  (202) 303-2000

Attorneys for Petitioners Patrick McKillen and Hume Street Management Consultants Limited

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE APPLICATION OF PATRICK MCKILLEN AND HUME STREET MANAGEMENT CONSULTANTS LIMITED<br><br>Petitioners | CASE NO.:  2:24-mc-62<br><br>**DECLARATION OF DAVID APELBAUM IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING FROM SHEIKH HAMAD BIN JASSIM** |

DECLARATION OF DAVID APELBAUM IN SUPPORT OF PETITIONER'S EX PARTE APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, David Apelbaum, declare and state as follows:

1. My name is David Apelbaum. I am a citizen of France, and I currently reside in Paris, France. I am over the age of twenty-one years old, I have never been convicted of a crime involving moral turpitude, and I am competent to make the statements contained herein.

2. I am a lawyer in France. I was admitted to practice law in France on 31 October 2012. I am a partner at Apelbaum Bendavid Poincloux Associés ("ABPA"), the law firm I founded in January 2020, and I have practiced in France for over a decade. My practice covers several areas of criminal defense with a focus on white-collar crime, including disputes related to corruption, tax evasion, embezzlement, fraud, and money laundering. I graduated from Sciences Po Law School in 2010 and from Paris-II University Law School in 2011. I currently teach criminal procedure at the Sciences Po Law School. I regularly publish articles on topics related to white-collar crime, criminal procedure, and media law. In 2015, I was elected Secretary of the Paris Bar Conference, in which role I served a one-year term and was part of the division for criminal defense of low income individuals accused of serious crimes. In 2022, I was recognized among thirteen "Next Generation Partners" by the 2022 edition of the Legal 500.

3. I represent Hume Street Management Consultants Limited ("HSMC") in pre-trial discovery proceedings in front of the Paris Commercial Court and related appellate proceedings (the "French Discovery Proceedings"). I will also represent HSMC in the future proceeding on the merits before the Paris Commercial Court against Constellation Paris SAS ("Constellation Paris"), a French company whose beneficial owner is Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani ("Sheikh Hamad bin Jassim") (the "French Merits Proceeding" and together with the French Discovery Proceedings, the "French Proceedings"). In this capacity, I have personal knowledge regarding the facts contained in this affidavit.

4. I attach hereto true and correct copies of the following documents that I refer to in this declaration: the April 29, 2021 email from Fady Bakhos to Patrick McKillen as **Exhibit 1**; the March 24, 2021 email from Fady Bakhos to Vinci Immobilier and Gleeds Project & Construction Management Services ("Gleeds") as **Exhibit 2**; the September 16, 2021 letter from Patrick McKillen to Fady Bakhos as **Exhibit 3**; the September 26, 2021 email from Fady Bakhos to Liam Cunningham as **Exhibit 4**; the September 23, 2021 email from Gleeds to Patrick McKillen as **Exhibit 5**; and the June 9, 2020 email from Fady Bakhos to Annemarie Ryan at the request of Sheikh Hamad bin Jassim as **Exhibit 6**.

5. I am submitting this Declaration in support of Petitioners' *Ex Parte* Application Pursuant to 28 U.S.C. § 1782 for an Order to take discovery upon Sheikh Hamad bin Jassim for use in a foreign proceeding. What follows is a description of the facts, as alleged in the French Proceedings.

I.      **BACKGROUND OF THE FRENCH PROCEEDINGS**

6. Petitioner Patrick McKillen ("McKillen") is a citizen of Ireland and the United Kingdom who resides in Europe. He is the owner and director of HSMC—the future plaintiff in the French Merits Proceeding and party to the existing pre-discovery proceedings.

7. Petitioner HSMC is an Irish Corporation with its principal place of business in Dublin, Ireland. HSMC will be the plaintiff in the French Merits Proceeding.

8. Constellation Paris, the anticipated defendant in the French Merits Proceeding, is a French company created for the purpose of the construction of a luxury hotel at 231, Boulevard Saint-Germain in Paris, France, whose ultimate beneficiary is Sheikh Hamad bin Jassim. Constellation Paris is chaired by Fady Bakhos ("Bakhos").

9. Respondent Sheikh Hamad bin Jassim is the former Minister for Foreign Affairs in Qatar, a position he held for two decades before becoming Prime Minister from 2007 to 2013. Sheikh Hamad bin Jassim is the beneficial owner of Constellation Paris and, equally along with another member of the Qatari royal family, the beneficial owner of Maybourne Hotels Limited, a service company of Maybourne Hotel Group.

10. In 2004, a group of investors including McKillen acquired three luxury hotels in London—The Connaught, The Berkeley, and Claridge's—and began to operate them as the Maybourne Hotel Group. Upon information and belief, Coroin Limited ("Coroin") became the parent company of subsidiaries holding each hotel, and Maybourne Hotels Limited was formed to provide support services to member hotels. In 2015, McKillen agreed to sell his share in Coroin to Séléné SàRL, a company owned by Respondent Sheikh Hamad bin Jassim. Following the acquisition, McKillen and HSMC continued to manage and renovate a number of Maybourne hotels.

11. Sheikh Hamad bin Jassim and his business partner, Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani ("Sheikh Hamad bin Khalifa") sought to expand the Maybourne Hotel Group internationally by acquiring, through various companies, two hotels, one in Los Angeles and the other in Roquebrune-Cap-Martin on the Côte d'Azur. They solicited HSMC, who agreed to provide management and redevelopment services with respect to the Côte d'Azur hotel (the "Maybourne Riviera Project") in 2018 and the Los Angeles hotel (the "Maybourne Beverly Hills Project") in 2019. Around the same time, Sheikh Hamad bin Jassim also sought to build a third hotel in Paris and identified an opportunity when the French government put the eastern portion of the historical seat of the French Ministry of Armed Forces, located at 231, Boulevard Saint-Germain in Paris, France (the "Saint-Germain"), up for sale. Development of the Saint-Germain into a luxury hotel would be the most challenging and ambitious

project of the three international projects, given that it did not involve redevelopment of an existing hotel, but the construction of a new hotel.

12. Given HSMC's experience with other successful Maybourne hotel management and renovation projects, in September 2018, Sheikh Hamad bin Jassim met with McKillen in London to discuss the Sheikh's interest in acquiring the Saint-Germain and transforming it into a luxury hotel (the "Saint-Germain Project"). Sheikh Hamad bin Jassim requested McKillen's expert opinion on whether it was a prudent investment. Shortly thereafter, McKillen visited the Saint-Germain site and advised Sheikh Hamad bin Jassim that, indeed, the Saint-Germain presented a good investment opportunity.

13. Taking McKillen's advice, Sheikh Hamad bin Jassim purchased the Saint-Germain in 2019 through his company created specifically for the transaction, Constellation Paris. Constellation Paris is chaired by Bakhos, a longtime advisor to the Qatari royal family and, particularly, Sheikh Hamad bin Jassim.

14. Simultaneously, Sheikh Hamad bin Jassim approached McKillen asking whether HSMC would serve as project manager on the Saint-Germain Project. McKillen agreed. Pursuant to this agreement with Sheikh Hamad bin Jassim and in keeping with HSMC's work on other projects for Sheikh Hamad bin Jassim and Sheikh Hamad bin Khalifa, McKillen and HSMC were engaged to oversee all aspects of the development of a new hotel on the Saint-Germain site. Gleeds was also retained as the primary contractor on the project, and Vinci Immobilier served as the real estate developer.

15. The Saint-Germain Project consisted of the complete creation of an ultra-luxury hotel, including almost 100 rooms, two swimming pools, a wellness center, anti-aging clinic, luxury boutiques, lounges, and restaurant and bar. HSMC developed plans for the creation of the new hotel, provided input and guidance at each stage of development, and supervised the project on-site. Specifically, immediately following HSMC's engagement and through September 2021, HSMC

reviewed and selected contractors for the project (including, though not limited to, architectural firms, real estate developers, and the primary contractor), reviewed and provided feedback on the design and structure of the hotel, provided feedback on the project's business plan and other financial aspects of the project, obtained administrative authorizations for the project, and played an instrumental role in presenting the project to the public on September 14, 2021. Nor were HSMC's opinions sought merely for the sake of receiving another opinion; rather, HSMC clearly had decision-making authority. Sheikh Hamad bin Jassim indicated as much during the project, saying, for example, that with respect to the involvement of an additional interior designer, "the ultimate decision lies with you [McKillen] on this matter." Ex. 1 at 13.

16. It is also clear that Sheikh Hamad bin Jassim considered HSMC and McKillen to be essential to the Saint-Germain Project. In an email to Gleeds and Vinci Immobilier dated March 24, 2021, Bakhos relays "instructions from the owner [Sheikh Hamad bin Jassim]" for Gleeds and Vinci Immobilier to develop the hotel "under Mr. McKillen's guidance and directives" and noting that the housing scheme is to be developed "in accordance with the layout to be determined by Mr McKillen." Ex. 2 at 19. What is more, throughout the duration of HSMC's involvement with the project, Sheikh Hamad bin Jassim and Constellation Paris postponed meetings if McKillen was not available and took care to ensure his availability ahead of other stakeholders, given his critical role on the project.

17. Thus, on September 16, 2021—two days following McKillen's participation in the presentation of the Saint-Germain Project to the public—HSMC sent Bakhos a letter containing a draft remuneration agreement for the Saint-Germain Project. Ex. 3. Indeed, HSMC had thus far worked on the project without a formal contract, as it was customary in the relation between McKillen and Sheikh Hamad bin Jassim—for example, in the earlier, more advanced Maybourne Riviera Project, HSMC had worked without contract before signing a partly retroactive

contract. HSMC's offer within the draft agreement was generous in two key respects. First, HSMC proposed the same level of remuneration as that explicitly agreed in exchange for HSMC's work on the Maybourne Riviera Project: two million euros per quarter. Given that the Maybourne Riviera Project required only two-thirds of the magnitude of work required for the Saint-Germain Project, HSMC's offer reflected a commercial discount to Constellation Paris of 33%. Second, though HSMC began its services on the Saint-Germain Project in September 2018, HSMC's draft agreement proposed that remuneration begin only from January 2021. Such an offer extended savings of more than ten million euros to Constellation Paris.

18. Even so, and despite HSMC's significant investment in the management of the project for a period of three years, on September 26, 2021, Bakhos sent an email to Liam Cunningham, McKillen's associate, refusing to compensate HSMC for project management work performed, boldly stating that "there is no project management work [in relation to the Saint-Germain Project] other than what is being undertaken by Gleeds." Ex. 4 at 26. This response was especially disingenuous in light of an email from Gleeds to McKillen sent three days earlier in which Gleeds highlighted "a number of important points in relation to Planning Application and Detailed design development [that] need[] your [HSMC's] participation[.]" Ex. 5 at 30. Given the absolute bad faith behavior of Constellation Paris, refusing to pay HSMC for its role as project manager and suggesting that no sum whatsoever was owed to HSMC, no further discussion could take place.

19. To this day, Constellation Paris has not compensated HSMC for services performed on the Saint-Germain Project, which is valued at tens of millions of euros. And, to date, HSMC has received no criticism with respect to the quality of its work on the project.

20. Rather, despite HSMC's significant investment in the Saint-Germain Project, payment for the work was withheld for reasons completely unrelated to the

quality of Petitioners' work on the Saint-Germain Project—and likely at the instruction of members of the Qatari royal family, namely Sheikh Hamad bin Jassim. In fact, *multiple* companies affiliated with Sheikh Hamad bin Jassim and Sheikh Hamad bin Khalifa have refused to pay HSMC compensation for project management services rendered with respect to the Maybourne Beverly Hills Project, the Maybourne Riviera Project, and *the Saint-Germain Project*.

21. What is more, there are several indications that Sheikh Hamad bin Jassim is personally involved in the facts that will be in dispute in the French Merits Proceeding, as de facto manager of Constellation Paris and accomplice in the contract breach by Constellation Paris. As an initial matter, Sheikh Hamad bin Jassim was personally involved in the Saint-Germain Project. He participated in meetings on, at minimum, September 18, 2018, November 26, 2018, March 28, 2019, March 18, 2021, and May 26, 2021. Sheikh Hamad bin Jassim would also issue express instructions concerning the development of the site on a regular basis, as exemplified by exchanges on June 9, 2020, March 24, 2021, and April 29, 2021. Exs. 6 at 33, 2 at 19, 1 at 13.

22. Furthermore, the systematic involvement of Bakhos, a personal advisor to Sheikh Hamad bin Jassim, in the Saint-Germain Project and his refusal to compensate HSMC for project management services rendered further evidences Sheikh Hamad bin Jassim's personal involvement in the disputed facts. Bakhos' close association with Sheikh Hamad bin Jassim is evident. For example, Bakhos' email address domain, @almirqab.com, corresponds to the Qatari company Al Mirqab, of which Sheikh Hamad bin Jassim is the sole economic beneficiary.

23. In anticipation of the French Merits Proceeding, HSMC has been engaged in pre-litigation discovery proceedings in front of the Paris Commercial Court. Specifically, in June 2023, HSMC sought pre-litigation discovery from Constellation Paris, Vinci Immobilier Promotion, and Sheikh Hamad bin Jassim via request under Article 145, an *ex parte* mechanism in French civil procedure by which

litigants can apply to the court to order investigative measures to preserve, before any trial, proof of facts upon which the resolution of a dispute may depend. HSMC has been unsuccessful in obtaining the ordering of pre-trial discovery measures at Sheikh Hamad bin Jassim's Paris office via this mechanism, given the high bar to pre-trial discovery under French law and the need to provide specific allegations regarding the location of potentially discoverable materials. Instead, the Court has authorized discovery against Constellation Paris and Vinci Immobilier Promotion to complete the record; while Vinci Immobilier Promotion complied with the order, Constellation Paris has thus far flatly refused to comply, as reported by the court-appointed bailiff.

## II. RESPONDENT AND THE DISCOVERY SOUGHT

24. Respondent Sheikh Hamad bin Jassim is not a party to the French Discovery Proceedings. What is more, I anticipate that it will be very difficult to successfully add Sheikh Hamad bin Jassim as a party to the French Merits Proceeding without additional discovery.

25. Respondent Sheikh Hamad bin Jassim was closely involved in the events underlying the French Merits Proceeding—that is, the hiring of HSMC as project manager, the instructions given to HSMC for its services, and the decision not to pay HSMC for these project management services—and, as a result, almost certainly has critical information to support HSMC's claims.

26. Respondent Sheikh Hamad bin Jassim is a citizen of Qatar. Sheikh Hamad bin Jassim engaged HSMC as project manager on the Saint-Germain Project and formed Constellation Paris for the purposes of the project, instructed other contractors to develop the Saint-Germain under HSMC's guidance, and attended meetings and issued instructions concerning the Saint-Germain Project. Further, Bakhos, who is Sheikh Hamad bin Jassim's personal advisor, refused payment to HSMC for project management services rendered on the Saint-Germain Project at

approximately the same time as other companies owned by Sheikh Hamad bin Khalifa, business partner of Sheikh Hamad bin Jassim, refused HSMC payment for services rendered on other hotel projects. Accordingly, Respondent Sheikh Hamad bin Jassim has documents and information crucial to supporting HSMC's claims.

27.   Petitioners plan to use this information to demonstrate (1) Sheikh Hamad bin Jassim's personal involvement in the commercial relationship with HSMC in connection with the Saint-Germain Project; (2) proof of bad faith of Constellation Paris and Sheikh Hamad bin Jassim (that, in refusing payment to HSMC, Constellation Paris was motivated by a bad faith order from Sheikh Hamad bin Jassim rather than an honest assessment of the value of HSMC's work on the project), which under French law enables plaintiffs to receive increased damages; and (3) that an agreement for remuneration was reached between HSMC and Constellation Paris at the outset and during the project, and that Constellation Paris and Sheikh Hamad bin Jassim were, in this regard, satisfied with HSMC's work, requiring the payment of sums equal to or greater than those proposed in Exhibit 3.

28.   For these reasons, Petitioners seek discovery and intend to use the documents and information obtained from such discovery in the French Merits Proceeding in front of the Paris Commercial Court, or before any jurisdiction seized of the matter.

29.   More specifically, as counsel for HSMC in the French Merits Proceeding, I plan to use the documents and testimony obtained from these parties to establish Sheikh Hamad bin Jassim's personal liability for sums owed to HSMC; establish bad faith on the part of Constellation Paris and HSMC in denying HSMC remuneration; and establish the existence of an agreement between HSMC and Constellation Paris at the outset and during the project providing for remuneration equal to or greater than that proposed by McKillen in his September 16, 2021 letter.

## III. SUITABILITY FOR PERMITTING DISCOVERY PURSUANT TO SECTION 1782

30. Permitting this discovery pursuant to § 1782 is appropriate in this case as Petitioner's application meets the threshold requirements of § 1782. Petitioners are "interested persons" in the French Merits Proceeding, as HSMC will bring the action, McKillen is the owner and director of HSMC, and I plan to use the discovery sought pursuant to § 1782 in the French Merits Proceeding.

31. Permitting this discovery pursuant to § 1782 is also appropriate because the relevant discretionary factors weigh in favor of permitting discovery.

32. As established, Respondent is not a party to the French Proceedings, and, without additional discovery and the aid of this Court, I anticipate that it will be very difficult, if not impossible, to successfully add him as a party to the French Merits Proceeding.

33. The documents and testimony sought are unavailable in the French Proceedings. First, French Civil Procedure dictates that litigants must seek discovery measures from a specific location (not from a specific individual) and to do so, they must provide specific allegations that documents are located in a given location. It is not possible for a litigant to require investigative discovery measures from a person, wherever this person may be; a specific place (workplace, personal home, etc.) must be targeted, with enough indication that requested documents may indeed be found at this place. Second, while French Civil Procedure allows litigants to ask for production of evidence from a third party in the course of litigation, the requesting party must specify exactly the document sought and demonstrate its existence, and cannot request the production of any document related to a specific subject. Third, within this context, French Civil Procedure does not offer the ability to take a deposition. Thus far, Petitioners have been unable to provide sufficient allegations to justify specific searches of Sheikh Hamad bin Jassim's Paris office or residence. Furthermore, we do not currently know where Sheikh Hamad bin Jassim

keeps the relevant information in his possession, and we have concerns it could be moved to evade the scope of French discovery and/or that parts of the relevant facts are simply known to Sheikh Hamad bin Jassim and not documented. The Paris Commercial Court is thus impeded in its ability to compel additional discovery from Sheikh Hamad bin Jassim, or otherwise obtain the information sought in Petitioners' § 1782 application, without the aid of a United States court.

34. Based on my years of practice in France, I believe the Paris Commercial Court—or any jurisdiction seized of the matter—will consider the information sought via § 1782 discovery. I know of no reason French courts would be unreceptive to discovery pursuant to § 1782, and believe that the Paris Commercial Court would accept evidence obtained through the discovery sought by Petitioners. I also consider such information to be crucial to the resolution of the French Merits Proceeding.

35. While Petitioners are seeking discovery that is currently unavailable under French procedure, there is nothing to suggest, and I have no reason to believe, that Petitioners are attempting to circumvent foreign proof-gathering restrictions. There is no applicable foreign proof-gathering restriction at issue that would bar obtaining this information through other lawful means. The French Code of Civil Procedure does not prohibit discovery in the United States in support of French civil proceedings, and indeed such discovery is utilized by French courts.

36. Given that Petitioners are uncertain of the physical location of the discovery they require, and believe that parts of the relevant information could be simply known by Sheikh Hamad bin Jassim, Petitioners' application here is solely trying to obtain discovery crucial to the resolution to the French Merits Proceeding for which there is no currently viable mechanism under French procedure given the information available to us.

37. The discovery sought is not unduly burdensome or intrusive, as Petitioners only seek information and documents that are narrowly tailored to obtain

information related only to what I anticipate will be the critical points at issue in the French Merits Proceeding.

38.     Pursuant to 28 U.S.C § 1746, I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: May 6, 2024

_____
David Apelbaum